ORIGINAL

FILED IN OPEN COURT
U.S.D.C. - Atlanta

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

OCT 1 7 2012

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal Indictment |
| | : | No. |
| v. | : | **1  12-CR-350** |
| | : | |
| APEGO, INC., | : | |
| CHI-CHENG GUNG, a/k/a "Curtis Gung," | : | |
| JENNIFER CHEN, | : | |
| FROMUS PSYCHE INTERNATIONAL, INC. | : | |
| CHONG-SIEN WU, a/k/a "Forth Wu," | : | |
| ZUORU HE, | : | |
| WATANABE PAPER PRODUCT | : | |
| (SHANGHAI) CO., LTD., | : | |
| WATANABE PAPER PRODUCT | : | |
| (LINQING) CO., LTD., and | : | |
| HOTROCK STATIONERY (SHENZEN) CO. | : | |

THE GRAND JURY CHARGES THAT:

## COUNT ONE

### The Conspiracy

1.     From at least in or about May 2006 through in or about February 2010, in the

Northern District of Georgia and elsewhere, defendants

APEGO, INC.,
CHI-CHENG GUNG, a/k/a "Curtis Gung,"
JENNIFER CHEN,
FROMUS PSYCHE INTERNATIONAL, INC.,
CHONG-SIEN WU, a/k/a "Forth Wu,"
ZUORU HE,
WATANABE PAPER PRODUCT (SHANGHAI) CO., LTD.,
WATANABE PAPER PRODUCT (LINQING) CO., LTD. and
HOTROCK STATIONERY (SHENZEN) CO.

together with others known and unknown to the Grand Jury, knowingly and willfully did conspire to commit offenses against the United States, that is,

      (a)     to enter, introduce and attempt to enter and introduce merchandise into the commerce of the United States, to wit, certain lined paper products imported from the People's Republic of China, by means of invoices and bills of lading that defendants knew to be fraudulent and false, in violation of Title 18, United States Code, Section 542; and

      (b) to knowingly effect an entry of goods, wares, or merchandise, to wit, certain lined paper products imported from the People's Republic of China into the Ports of Los Angeles, Norfolk, Newark, Atlanta, Oakland and other U.S. ports, at less than the true weight or measure thereof, and with a false classification as to quality or value, and by the payment of less than the amount of duty legally due, in violation of Title 18, United States Code, Section 541.

### The Defendants and Others

At all times material to this indictment:

      2.     Defendant APEGO, INC. ("APEGO") was a corporation organized under the laws of Texas with its headquarters in Lilburn, Georgia until in or around October 2006, and thereafter at 1750 Spectrum Drive, Lawrenceville, Georgia. Defendant APEGO was in the business of importing, exporting, and manufacturing stationery products. At or around the end of 2007, defendant APEGO also began doing business as Aclor, Inc. in response to scrutiny raised by anti-dumping issues, as described in this Indictment. Doing business as Aclor, Inc., the company continued to be a major source of stationery for office supply companies and other large retail sellers of stationery in the United States. In addition to its headquarters offices in Georgia, defendant APEGO had sales offices and a light manufacturing plant in Tainan, Taiwan and a sales office in Guangzhou in the People's

2

Republic of China ("China"). In or around June 2007, defendant APEGO opened an office and manufacturing plant in Nuevo Laredo, Mexico.

3.     Defendant CHI-CHENG GUNG, a/k/a "Curtis Gung," a citizen of Taiwan and naturalized citizen of the United States, was the president, chief executive officer, and a major shareholder of defendant APEGO.

4.     Defendant JENNIFER CHEN, a citizen of Taiwan and naturalized citizen of the United States, was an employee and at times material to this indictment the chief financial officer of defendant APEGO.

5.     Defendant FROMUS PSYCHE INTERNATIONAL, INC. ("FROMUS") was a corporation headquartered in and organized under the laws of Taiwan. Defendant FROMUS was also a shareholder of defendant APEGO.

6.     Defendant CHONG-SIEN WU, a/k/a "Forth Wu," a citizen of Taiwan, was the founder of defendant APEGO and an officer and shareholder of defendant FROMUS.

7.     Defendants WATANABE PAPER PRODUCT (SHANGHAI) CO., LTD., WATANABE PAPER PRODUCT (LINQING) CO., LTD., and HOTROCK STATIONERY (SHENZEN) CO. (referred to collectively in this Indictment as "THE WATANABE GROUP") were three inter-related companies based in and incorporated in China.

8.     Defendant ZUORU HE was a citizen and resident of China and the controlling shareholder of defendants THE WATANABE GROUP. "R.Y." was his executive assistant.

9.     Honetech International, Inc. ("Honetech") was a corporation headquartered in and organized under the laws of Taiwan, and based in Tainan, Taiwan.

3

10.     "H.T." was a freight forwarding and customs clearance agency based in Taiwan that acted as a customs broker and/or agent for the importation and exportation of lined paper products by defendant APEGO in Taiwan.

11.     "A.Z." was a citizen and resident of Taiwan and an employee or agent of H.T., who acted as a customs broker and/or agent for the importation and exportation of lined paper products by defendant APEGO in Taiwan.

12.     "F.Z," "C.H." and "R.K" were residents of China and employees of defendant APEGO's sales office in Guangzhou, China.

13.     "Jo. C." and "J.H." were residents of Taiwan and employees of defendant APEGO's sales office in Tainan, Taiwan.

14.     "F.B.", "C.C.", "A.C.", "J.G." , "E.T.", and "S.C." and were residents of the United States and employees of defendant APEGO's head office in Lawrenceville, Georgia.

15.     Customer A was a large retail chain based in the United States with stores in 49 states and annual sales of lined paper products in the tens of millions of dollars. Customer A was a major customer of defendant APEGO from 2006 through 2008, with annual purchases of lined paper products from APEGO in the millions of dollars.

16.     Customer B was an office supply chain store based in the United States with stores in 45 states and 26 countries.   Customer B was a major customer of defendant APEGO from 2007 through 2008, with annual purchases of lined paper products from APEGO in the millions of dollars.

17.     Customer C  was a drug store chain based in the United States with stores in all 50 states, the District of Columbia and Puerto Rico. Customer C was a major purchaser of filler paper from defendant APEGO in 2007.

4

## Background

### Relevant Customs Procedures

18.     In or about March 2003,  the Bureau of Customs and Border Protection, U.S. Department of Homeland Security ("CBP"), succeeded the U.S. Customs Service under the Homeland Security Act of 2002 and became responsible for administering the Tariff Act of 1930, as amended. This responsibility included the assessment and collection of duties, taxes, and fees on merchandise imported into the United States and the examination of such merchandise to ensure its admissibility into, and compliance with the laws of, the United States.

19.     Under Title 19, United States Code, Section 1484, an "Importer of Record" or the importer's authorized agent, such as a customhouse broker, was required to file entry documents with CBP for goods to be imported into the United States.  These entry documents, which were required to be filed when a shipment of goods reached the United States, included CBP Form 7501, CBP Form 3461, a commercial invoice, a packing list, and a bill of lading.  Goods intended for import into the United States could not legally enter into the United States until the shipment arrived within the port of entry and delivery was authorized by CBP.

20.     CBP relied upon the commercial invoice or bill of lading to provide an accurate description of the imported merchandise, its origin and manufacturer, the sales price, the terms of the sale, and duties owed, including duties determined by law.  Those duties included antidumping duties described below.  Importers were required to declare to CBP the true price paid or agreed to be paid for the merchandise on the commercial invoice and on other import documents.  Importers were also required to identify, if applicable, the antidumping duty case number on importation documents for any merchandise included in an antidumping case and to deposit estimated antidumping duties at the

5

time of entry.

21.     CBP used a computer system known as the Automated Commercial System, ("ACS") which included information about all shipments entering the United States through ports of entry. If no physical examination of the goods took place, a CBP official would review entry documents and the data entered in the ACS about the importation. If the CBP official determined that the documents and data were complete and in order, then the official signed CBP Form 3461, approving the release of the shipment into commerce. This process was called a "general" entry. All entries were submitted electronically to CBP through the Automated Broker Interface ("ABI"). In most cases the physical paper copies of the entry packet (e.g., CBP Form 7501, CBP Form 3461, and commercial invoice) were not required to be provided to CBP. These entries were considered "paperless."

### Antidumping Duties Generally

22.     "Dumping" is the practice of selling merchandise manufactured abroad at below cost in the United States to increase market share by driving domestic manufacturers from the market. Antidumping duties are duties imposed to offset the effects of this unfair trade practice that gives imports an unfair advantage over competing United States goods. Antidumping duties are assessed on imported merchandise that is sold, or is likely to be sold, in the United States at less than its fair market value. For antidumping duties to be imposed, it must have been determined that, in addition to the sale of imported merchandise at less than fair market value, the importation of such merchandise injured a U.S. industry.

23.     The U.S. Department of Commerce, the U.S. International Trade Commission ("ITC"), and CBP all play a role in enforcing antidumping laws. The Department of Commerce is responsible for their general administration. It determines whether the merchandise was sold at less than fair

6

market value, and also determines the amount of duties that must be assessed. The ITC determines

if imports were injuring a United States industry. CBP assesses the duties once the Department of

Commerce and the ITC have made the necessary determinations.

### Lined Paper Products from Mainland China - Antidumping Duties

24.     In or about October 2005, the Department of Commerce began to investigate whether

certain lined paper products imported from China were being sold in the United States at less than

fair market value. Such lined paper products included lined school looseleaf paper and lined school

notebooks. Antidumping case number A-570-901 was initiated.

25.     On or about April 17, 2006, the Department of Commerce and ITC made a preliminary

determination that manufacturers and exporters of lined paper products in China were exporting their

products to the United States at less than fair market value. The Department of Commerce directed

CBP to begin collecting antidumping duties on imports of lined paper products made in China. No

manufacturers and exporters of lined paper products made in China were excluded from the

antidumping duties. The antidumping duty rates for manufacturers and exporters of lined paper

products made in China ranged from 52.10 percent to 258.21 percent of the value of the shipment,

depending on the extent to which their export prices were determined to be predatory. Importers of

such products into the United States were required to pay antidumping deposits to CBP upon entry

of their shipments in amounts determined by CBP from the percentage applicable to the source of the

lined paper products in China.

26.     On or about August 31, 2006, the Department of Commerce issued its final

determination that lined paper products made in China were being imported into the United States

at less than fair market value, and made a final determination that the appropriate antidumping duties

7

ranged from 76.70 percent to 258.21 percent.

27.     No antidumping duties were imposed on imports of lined paper products from the Republic of China, the separately governed island to the east of China also known as Taiwan.    In 2005 and preceding years, the value of U.S. imports of lined paper products from China was several times the volume of its imports of similar products from Taiwan.

28.     Among the exporters and manufacturers on which the Department of Commerce and ITC imposed antidumping duties were defendants THE WATANABE GROUP.  The antidumping duty imposed on defendants THE WATANABE GROUP was usually 76.7 percent, in part because of THE WATANABE GROUP's ostensible cooperation in the ITC's  anti-dumping investigation, but in some periods was higher.

### Manner and Means of the Conspiracy

The foregoing objects of the conspiracy were accomplished as follows:

29.     It was part of the conspiracy that from in or about May 2006 through in or about August 2007, defendants APEGO, CHI-CHENG GUNG, a/k/a "Curtis Gung," FROMUS PSYCHE INTERNATIONAL, INC., and CHONG-SIEN WU, a/k/a "Forth Wu," caused the entry and the introduction into the commerce of the United States of hundreds of oceangoing container loads of lined paper products made in China by defendants THE WATANABE GROUP, with an estimated value of $21,162,937.00, using false and fraudulent entry documents, including false and fraudulent invoices and bills of lading, thereby avoiding an antidumping duty of at least 76.7 percent on each shipment and approximately totaling over $20 million in anti-dumping duties.

30.     It was further part of the conspiracy that defendant APEGO purchased notebooks, filler paper and other lined paper products from defendants THE WATANABE GROUP in China for

export to the United States. Beginning in or about April 2006, these products were subject to the antidumping duties on lined paper products made in China.

31.     It was further part of the conspiracy that defendant APEGO used various strategies to cause lined paper products purchased from defendants THE WATANABE GROUP in China to appear to have been made in Taiwan, including the following: Defendant APEGO hired extra labor and obtained warehouse space in Taiwan to "rework" (i.e., repackage and relabel) notebooks and other lined paper products imported by defendant APEGO into Taiwan from defendants THE WATANABE GROUP in China for transshipment to the United States. In some cases, defendant APEGO replaced the cover and back pages on products originally marked "Made in China," or not originally marked with any country of origin, so that they were falsely labeled "Made in Taiwan." In other cases, defendant APEGO had defendants THE WATANABE GROUP print "Made in Taiwan" on the products but cover that label with a "Made in China" sticker, which defendant APEGO would cause to be removed in Taiwan, among other stratagems.

32.     It was further part of the conspiracy that H.T. and A.Z., Taiwanese customs brokers, paid bribes to Taiwanese customs officials on behalf of defendants APEGO and CHI-CHENG GUNG, a/k/a "Curtis Gung," to allow U.S.-bound lined paper products made by the Watanabe Group in China but lacking required country of origin labels, or mislabeled "Made in Taiwan," to enter Taiwan from China and clear Taiwanese customs.

33.     It was further part of the conspiracy that defendants APEGO and CHI-CHENG GUNG, a/k/a "Curtis Gung," prepared and caused to be prepared false and fraudulent documents for the entry into the United States of shipments of Chinese-made lined paper products. Defendant APEGO provided false and fraudulent invoices, bills of lading, and packing lists for these shipments

to freight forwarders and/or brokers. These invoices, bills of lading, and packing lists falsely identified the country of manufacture as Taiwan, and listed the manufacturer as a Taiwanese company, such as Honetech, that was not subject to antidumping duties, when in fact, as defendants APEGO, CHI-CHENG GUNG, a/k/a "Curtis Gung," FROMUS PSYCHE INTERNATIONAL, INC., and CHONG-SIEN WU, a/k/a "Forth Wu," knew, the products were made by defendants THE WATANABE GROUP in China, and were therefore subject to an antidumping duty of 76.7 percent or higher. These entry documents were also false and fraudulent in failing to state that the accompanying goods were subject to an antidumping duty upon entry into the United States. The freight forwarder and/or brokers, in turn, provided these false and fraudulent entry documents to CBP.

34.     It was further part of the conspiracy that the defendants misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the true causes and nature of the their acts done in furtherance of the conspiracy, and misrepresented, concealed, and caused to be misrepresented and concealed the true nature of the conspiracy.

## Overt Acts

35.     The following overt acts were committed in furtherance of the conspiracy in the Northern District of Georgia and elsewhere:

a.     On or about April 25, 2006, eight days after the Department of Commerce issued its preliminary determination imposing dumping duties on lined paper products made in China, defendant CHI-CHENG GUNG, a/k/a "Curtis Gung," sent an email to F.B., defendant APEGO's Vice President of Sales at its headquarters in Georgia, directing F.B. to inform Customer A that its multi-million dollar order of paper products would come from China; in that email, defendant CHI-CHENG GUNG, a/k/a "Curtis Gung," instructed F.B. to inform Customer A that to expedite the shipment,

Customer A would have to proceed with "no factory audit" and "no inspection" in Taiwan in order to conceal the fact that defendant APEGO had no factory for making lined paper products in Taiwan.

b.    On or about May 4, 2006, defendant CHI-CHENG GUNG, a/k/a "Curtis Gung," sent an email entitled "Watanabe" to defendant CHONG-SIEN WU, a/k/a "Forth Wu," and several APEGO employees stating that "we decide to process the [Customer A] order." The email instructed J.L., defendant APEGO's logistics operations manager, to prepare a purchase order to fulfill the first order from Customer A, to be shipped on May 23, 2006, and noted that defendant APEGO still needed to confirm shipping details for this order with the manufacturer, THE WATANABE GROUP.

c.    On or about June 15, 2006, defendant CHONG-SIEN WU, a/k/a "Forth Wu," forwarded an email to defendant CHI-CHENG GUNG, a/k/a "Curtis Gung," defendant JENNIFER CHEN, and others entitled "Re-working for [Customer A] on 11/Jun/2006." The email had photographs attached showing workers in Taiwan relabeling and repackaging boxes of notebooks made by defendants THE WATANABE GROUP in China and destined for Customer A in the United States in order to make the notebooks appear to have been made in Taiwan.

d.    On or about June 19, 2006, defendant APEGO created or caused to be created APEGO invoice #S06061901, a packing list, and other export documentation for the shipment of approximately 150,336 notebooks from Kaohsiung, Taiwan to Customer A in the United States, Entry Number 231-2773199-3 (Shipment #1); that invoice falsely and fraudulently stated that the notebooks were manufactured by defendant FROMUS in Taiwan when in fact they were made by defendants THE WATANABE GROUP in China.

e.    On or about June 26, 2006, defendants CHONG-SIEN WU, a/k/a "Forth Wu,"

11

sent an e-mail entitled "FW: Don't Worry" to F.B. explaining defendant APEGO's efforts to have 136 containers of paper products destined for Customer A produced in China and transhipped to the United States through Taiwan.

f.      On or about June 26, 2006, defendant APEGO created or caused to be created APEGO invoice #S06062602, a packing list, and other export documentation for the shipment of approximately 219,234 notebooks from Kaohsiung, Taiwan to Customer A in the United States, Entry Number 231-2773228-0 (Shipment #2); defendant APEGO falsely and fraudulently stated on the invoice that notebooks were manufactured by defendant FROMUS in Taiwan when in fact they were manufactured by THE WATANABE GROUP in China.

g.      On or about June 26, 2006, APEGO created or caused to be created APEGO invoice #S06062601, a packing list, and other export documentation for the shipment of approximately 338,256 notebooks from Kaohsiung, Taiwan to Customer A in the United States, Entry Number 231-2773227-2 (Shipment #3); defendant APEGO falsely and fraudulently stated on the invoice that the notebooks were manufactured by defendant FROMUS in Taiwan when, in fact, they were made by defendants THE WATANABE GROUP in China.

h.      On or about June 26, 2006, defendant CHONG-SIEN WU, a/k/a "Forth Wu," sent an email to sales representative F.B. of defendant APEGO about a newly negotiated order of lined paper products to be made by defendant THE WATANABE GROUP and transhipped through FROMUS in Taiwan to APEGO in the United States; the email stated in part, "Thanks for your big gift and challenge! . . . we play game with bank, mill, forwarder, custom, and logistics. . . . Watarabe [sic] the only one can do in China; 136 container within less than 30 days."

i.      On or about June 27, 2006, defendant APEGO exported Shipment #1,

containing 150,336 notebooks, in cartons falsely labeled "Made in Taiwan," from Kaohsiung, Taiwan to Customer A in the United States via Oakland, California; the shipment had been falsely labeled "Made in Taiwan" by defendant APEGO in order to circumvent anti-dumping duties in the United States.

        j.      On or about July 3, 2006, defendant APEGO exported Shipment #2, containing 219,234 notebooks, in cartons falsely labeled "Made in Taiwan," from Kaohsiung, Taiwan to Customer A in the United States via Oakland, California; the shipment had been falsely labeled "Made in Taiwan" by defendant APEGO in order to circumvent anti-dumping duties in the United States.

        k.      On or about July 4, 2006, defendant APEGO exported Shipment #3, containing 338,256 notebooks, in cartons falsely labeled "Made in Taiwan," from Kaohsiung, Taiwan to Customer A in the United States via Oakland, California; the shipment had been falsely labeled "Made in Taiwan" by defendant APEGO in order to circumvent anti-dumping duties in the United States.

        l.      On or about July 17, 2006, A.C. of APEGO's Georgia headquarters sent an email to R.Y. of defendants THE WATANABE GROUP in China, copied to defendant CHI-CHENG GUNG, a/k/a "Curtis Gung," and entitled "[Customer B's] Paper Needs." In that email, A.C. listed Customer B's specifications for notebooks and other lined paper products under negotiation for purchase from defendant APEGO, and A.C. asked R.Y. to "review with factory and let us know if you can reach the best arrival date to Kaohsiung before July 27th that Taiwan can ship out the first shipment on August 4th."

        m.      On or about July 17, 2006, R.K. of defendant APEGO's China office sent an

13

email entitled "[Customer B's] Paper Needs" to defendant CHI-CHENG GUNG, a/k/a "Curtis Gung," in which R.K. suggested that defendant APEGO insert a middleman between itself and defendants THE WATANABE GROUP for imports of lined paper products from China to the United States through Taiwan, because otherwise "it is too easy to check it out by customs," and R.K. further suggested that "Apego purchase from Fromus, Fromus purchase from Watanabe. (F.Z. told me that [Customer A's] order also need revise this way so can avoid any trouble from Customs)."

n. On or about July 17, 2006, defendant CHI-CHENG GUNG, a/k/a "Curtis Gung," responded to R.K.'s email of the same date, copying defendant JENNIFER CHEN and others and stating,"Will proceed order to Fromus, and Fromus buy from watanabe."

o. On or about July 26, 2006, defendants CHONG-SIEN WU, a/k/a "Forth Wu," and CHI-CHENG GUNG, a/k/a "Curtis Gung," met with defendant ZUORU HE, in Atlanta, Georgia, while defendant ZUORU HE was in the United States to attend an ITC hearing about the imposition of anti-dumping duties on lined paper products made in China. At the meeting in Atlanta, defendants CHONG-SIEN WU, a/k/a "Forth Wu," CHI-CHENG GUNG, a/k/a "Curtis Gung," and ZUORU HE planned APEGO's continued importation into the United States of notebooks and other lined paper products made by defendants THE WATANABE GROUP in China, and the continued false labeling of these shipments as "Made in Taiwan" to avoid anti-dumping duties.

p. On or about July 26, 2006, S.W., on behalf of a freight forwarding company in Los Angeles, California, sent an email to defendant APEGO stating, "We all ready to handle in coming movements from China via Taiwan to USA, 3 days before vessel arrival Long Beach port, we can start of your import Customs entry . . . We already have our warehouse clear and clean for more space for unload containers. . . ."

14

q.     On or about August 14, 2006, defendant CHI-CHENG GUNG, a/k/a "Curtis Gung," sent an email to R.Y. at defendants THE WATANABE GROUP and to an employee at APEGO's office in China saying,  "We can not show anything Watanabe. M.C. does not know we do any production in China at all."   M.C. was a representative for C.S.I., APEGO's agent for sales of lined paper products to Customer A.

r.     On or about November 8, 2006, after Taiwanese customs officials at Kaohsiung port in Taiwan discovered that one of defendant APEGO's shipments of notebooks from China improperly contained no country of origin and would be sent back to China, defendant APEGO's shipping agent in Taiwan advised F.Z. of APEGO's China office that APEGO needed to change ports in Taiwan in order to avoid such inspections by Taiwanese Customs.   F.Z. sent an email in Mandarin to defendant CHI-CHENG GUNG, a/k/a "Curtis Gung," stating that a "container was caught by the police for its place-of-origin problem at the place with a new system.  The police rarely follow the container in order to see the procedure.  R.Y informed defendant GUNG that defendant APEGO's customs broker in Taiwan had arranged for a shipment due in from China the next day to avoid entering the same dock at the Port of Kaohsiung, and that F.Z. had informed R.Y. to put another shipment from defendant WATANABE GROUP on hold.

s.     On or about November 17, 2006, defendant CHI-CHENG GUNG, a/k/a "Curtis Gung," sent an email to V.S. of defendant APEGO's Taiwan office, copied to defendant CHONG-SIEN WU, a/k/a "Forth Wu," and R.Y. of defendants THE WATANABE GROUP in China, stating: "Very important, keep in mind, if anybody call you for some questions: ... 2. never share any information about our paper mill factory, and any our paper production procedure.  3. never say we import paper from china. All we use is Taiwan paper, where buy it from Taiwan, always say 'we can

not discuss this' only we can say is from Taiwan. And never agree and admit we use Chinese paper for [Customer A] or [Customer B]. No Chinese paper used in Taiwan factory."

        t.      On or about November 20, 2006, F.Z. of defendant APEGO's China office sent an email to defendant CHI-CHENG GUNG, a/k/a "Curtis Gung," and other APEGO employees advising them about the unsatisfactory appearance of "Made in Taiwan" labels stamped by workers hired by APEGO in Taiwan onto marble composition notebooks made by defendant THE WATANABE GROUP in China for transshipment by APEGO to the United States. In that email, F.Z. recommended placing "Made in Taiwan" stickers over the ink-jet "Made in Taiwan" labels to hide the shoddy and fraudulent relabeling.

        u.      In or about December 2006, defendants APEGO and FROMUS, through defendant APEGO's customs brokers H.T. and A.Z., arranged for the payment of bribes to Taiwanese customs officials at Kaohsiung port on the west coast of Taiwan, with the bribes to be recorded as "miscellaneous fees" on defendant APEGO's books and records. These defendants arranged for the payment of bribes to the customs officials so that the customs officials would permit defendant APEGO to import into Taiwan notebooks and other lined paper products made in China with certain irregularities, including false and fraudulent "Made in Taiwan" markings already printed on the products and sometimes on the cartons containing them, or without any required country of origin markings. This arrangement allowed defendant APEGO to transship these products from Taiwan to the United States more quickly and less expensively by limiting the need to "rework" the products and cartons (i.e., relabel "Made in Taiwan") in Taiwan.

        v.      On or about January 10, 2007, A.C. of defendant APEGO's Georgia office sent an email to F.Z. of defendant APEGO's China office entitled "Order to Watanabe" and containing

an attachment listing filler paper and different types of notebooks. The email stated, "The attached is the order to Watanabe for your review. Please check if anything needs to change?"

w.      On or about February 9, 2007, defendant JENNIFER CHEN sent an email and attached flow chart to defendant FORTH WU, defendant CHI-CHENG GUNG, a/k/a "Curtis Gung, and other employees of defendants APEGO and FROMUS. In the email and flow chart, defendant JENNIFER CHEN outlined two options for defendants APEGO and FROMUS to consider for future shipments in order to avoid detection of the anti-dumping duty evasion scheme, along with the advantages and disadvantage of the two options. Her proposed options were to work with a reputable and established company in Taiwan to serve as a front for APEGO, or use a new or little used corporate name already in their control such as Honetech.

x.      On or about February 21, 2007, defendant CHI-CHENG GUNG, a/k/a "Curtis Gung," emailed C.C., defendant APEGO's new logistics operations manager in Georgia, to rebuke him for informing C.S.I., defendant APEGO's agent for sales to Customer A, that defendant APEGO had a large quantity of black composition notebooks in a warehouse that improperly contained no country of origin label; C.C. replied, "I just need to know when I should lie and when should I tell the truth."

y.      On or about February 27, 2007, defendant CHI-CHENG GUNG, a/k/a "Curtis Gung," sent an email with several attachments to defendant CHONG-SIEN WU, a/k/a "Forth Wu" in Taiwan; R.Y., executive assistant to defendant ZUORU HE of THE WATANABE GROUP in China; and V.C., copying defendant JENNIFER CHEN and other APEGO employees. The email stated, "Confidential.!!!  Please check it and use this as a guide line [sic]." The attachments were PowerPoint slides with flow charts marked "Trade Process" and "Payment Process" created by an

17

APEGO employee at defendant GUNG's direction and forwarded by the employee to defendants GUNG and JENNIFER CHEN. The flow charts illustrated the plan by defendant CHI-CHENG GUNG, a/k/a "Curtis Gung," to disguise the fact that defendants THE WATANABE GROUP in China were the source of lined paper products to be sold and delivered by APEGO to Customer B in China  Through the use of these flow charts, defendant CHI-CHENG GUNG, a/k/a "Curtis Gung," directed APEGO employees to create the appearance that two affiliated Taiwanese companies, Honetech and/or FROMUS, were the manufacturers of and payees for lined paper products imported by defendant APEGO, when the products actually were made by defendants THE WATANABE GROUP in China and exported to Taiwan for transshipment to the United States.  At the end of the email, defendant CHI-CHENG GUNG, a/k/a "Curtis Gung," instructed R.Y., "[R.], please print out for Mr. [defendant ZUORU] He."

    z.  In or about March 2007, when customs officials in Kaohsiung, Taiwan would no longer accept bribes, defendants APEGO and FROMUS, through defendant APEGO's customs brokers H.T. and A.Z., arranged for the payment of bribes to Taiwanese customs officials at the port of Keelung in northern Taiwan, with the bribes to be recorded as "miscellaneous fees" on defendant APEGO's books and records.  These defendants arranged for the payment of the bribes to the Taiwanese customs officials to permit defendant APEGO to import notebooks and other lined paper products made in China but already labeled "Made in Taiwan" so that the products could be more quickly re-exported to the United States without extensive relabeling or "reworking" in Taiwan so that defendant APEGO could evade the imposition of anti-dumping duties upon the arrival of the goods in the United States.

    aa.  On or about March 21, 2007, A.C., an employee of defendant APEGO's

Georgia office, sent an email in Mandarin to F.Z. in defendant APEGO's China office and copying

defendant CHI-CHENG GUNG, a/k/a "Curtis Gung"; V.S., an employee of APEGO in Taiwan; and

C.H., an employee of APEGO in China on the email.   In that email, A.C. stated that "[V.S.] and

[A.Z.] have reached an agreement with customs about how to do it.   When a group of customs

officers open a container and do not see 'MADE IN TAIWAN' signs on the outer cases, they will let

us pass through customs secretly.  However, if they open the container and see 'MIT' on the outer

cases and give us a hard time, it will affect all containers that enter Keelung later by offering bribes.

It may have an even more serious impact on us as pass through the Port of Keelung.  It will be the end

for us.  We have not been able to pass through the Port of Kaohsiung by offering bribes as we used

to.  At present, the Port of Keelung is our only short-cut.  Should we reconsider not printing 'MIT'

on the outer cases that will be shipped to Taiwnan?"

       bb.   On or about March 21, 2007, F.Z. responded to A.C.'s email of the same date

and copied defendant CHI-CHENG GUNG, a/k/a "Curtis Gung," V.S. and C.H.  In that email, F.Z.

noted that Customer B required more "Made in Taiwan" stamps on the containers for its imports, and

set forth the costs of having the containers labeled in Taiwan.   F.Z. added that he had spoken again

with A.Z., customs broker for defendant APEGO in Taiwan, and that A.Z. informed F.Z. that "she

could handle the customs.  If we increase the miscellaneous fee to NT $10,000 per container,"

APEGO would be able to import the containers into Taiwan already labeled "Made in Taiwan at the

factory." For orders from other customers, however, F.Z. stated, "we will stamp the boxes as we used

to when they arrive in Taiwan."

       cc.   On or about March 22, 2007, F.Z. informed R.Y. of defendants THE

WATANABE GROUP, in an email entitled "Customer B Order, Shipping Mark MIT & seal of

19

guarantee for outer cases, "Our original plan was to get all of them stamped when they arrive in Taiwan, but now we think it is too tedious to stamp all bottoms. The customs broker in Taiwan has talked to the customs. As long as we increase the miscellaneous fee to NT$10,000 per container, there should be no problem for us to print all outer-case information in the Mainland before shipping them. We have talked to Mr. Xu in Shanghai. He said that it should not be a big problem to ship them from Shanghai. They have tried that before by sending three containers of composition [notebooks] with printed shipping marks on them. Please find out whether we can do the same thing when shipping [Customer B's] products from Shenzen," another port city in China.

dd.    On or about March 29, 2007, defendant APEGO caused a false and fraudulent invoice and packing list for filler paper with an entry value of $169,921.00, namely invoice number S07032901H, to be fabricated for entry 231-5975468-1 (Shipment #4), and provided to a freight forwarder for the purpose of providing these entry documents to CBP at the Port of Los Angeles in Los Angeles, California. The invoice and packing list falsely indicated that defendant APEGO was the manufacturer of the filler paper and that Taiwan was the country of origin, when in fact the shipment contained notebooks manufactured by THE WATANABE GROUP in China. The false and fraudulent invoice and packing list were later provided to CBP by the freight forwarder.

ee.    On or about March 29, 2007, defendant APEGO caused a false and fraudulent invoice and packing list for filler paper with an entry value of $170,239.00, namely invoice number S07032901G1 and bill of lading number YMLUW20203005, to be fabricated for entry 231-597508-4 (Shipment #5), and provided to a freight forwarder for the purpose of providing these entry documents to CBP at the Port of Los Angeles in Los Angeles, California. The invoice and packing list falsely indicated that defendant APEGO was the manufacturer of the filler paper and that Taiwan

20

was the country of origin, when, in fact, the shipment contained notebooks manufactured by THE WATANABE GROUP in China. The false and fraudulent invoice and packing list were in fact later provided to CBP by the freight forwarder

 ff. On or about April 3, 2007, defendant APEGO exported Shipments #4 and #5, in cartons falsely labeled "Made in Taiwan," from Keelung, Taiwan to Customer C in the United States via Los Angeles, California; these shipments were falsely labeled "Made in Taiwan" in order to circumvent anti-dumping duties in the United States.

 gg. On or about May 10, 2007, defendant APEGO caused false and fraudulent invoices and packing lists for composition notebooks, subject notebooks and filler paper, 851,940 pieces with an entry value of $244,336.00, namely, invoice number HI-0510-2007 dated May 10, 2007, and bill of lading number TPARL0705006 dated May 10, 2007, for entry MN8-1010359-3 (Shipment #6), to be fabricated and provided to a freight forwarder for the purpose of providing these entry documents to CBP at the Port of Los Angeles in Los Angeles, California. The invoices and packing lists were fraudulently printed on the letterhead of "Honetech International Inc., No. 19, Jiann Ping 3 Street, An Ping Dist., Tainan" to falsely indicate that Honetech was the manufacturer. The invoice fraudulently stated "Made in Taiwan." The false and fraudulent invoices and packing list were, in fact, later provided to CBP by the freight forwarder.

 hh. On or about May 15, 2007, defendant APEGO exported Shipment #6, in cartons falsely labeled "Made in Taiwan," from Kaohsiung, Taiwan to Customer B in the United States via Los Angeles, California; the shipment was falsely labeled "Made in Taiwan" in order to circumvent anti-dumping duties in the United States.

 ii. On or about May 18, 2007, defendant APEGO caused false and fraudulent

invoices and packing lists for approximately 124,800 notebooks, with an entry value of $235,871, namely, invoice numbers S07051801, S07051802, and S07051806, for entry 231-6126758-1 (Shipment #7), to be fabricated and provided to a freight forwarder for the purpose of providing these entry documents to CBP at the Port of Los Angeles in Los Angeles, California. The invoice, bill of lading and packing list falsely indicated that defendant APEGO was the manufacturer of the filler paper and that Taiwan was the country of origin, when in fact the shipment contained notebooks manufactured by THE WATANABE GROUP in China. These false and fraudulent invoices were later provided to CBP by the freight forwarder.

   jj. On or about May 23, 2007, defendant APEGO exported Shipment #7, in cartons falsely labeled "Made in Taiwan," from Kaohsiung, Taiwan to Customer B in the United States via Los Angeles, California. This shipment was falsely labeled "Made in Taiwan" in order to circumvent anti-dumping duties in the United States.

   kk. On or about May 24, 2007, defendant CHI-CHENG GUNG, a/k/a "Curtis Gung," sent an email to R.Y. at defendants THE WATANABE GROUP in China asking whether any visitors to Watanabe factories have "seen you are producing Apego product which [sic] 'made in Taiwan' logo. If yes, we will have deep trouble. Last time I went to Shenzen and shanghai factory, I saw Apego product and samples all over place. That is very easy to explore our 'secret'. Please be carefully and tell everybody. WE CAN NOT BURN THE BRIDGE." R.Y. assured CHI-CHENG GUNG, a/k/a "Curtis Gung," in a reply email that "I already refuse any customer visit our plant these days."

   ll. On or about May 30, 2007, defendants APEGO and FROMUS caused to be created false and fraudulent export documentation for a shipment of lined paper products to Customer

B in the United States. Invoice numbers S07053007, S07053001, S07053004 and S07053008, each dated May 30, 2007, falsely listed "Apego, Inc. Taiwan" as the manufacturer of notebooks and filler paper to be shipped to the United States as entry 231-6128453-7, namely 191,992 pieces with an entry value of $230,041.00 (Shipment #8), when in fact the shipment contained lined paper products manufactured by THE WATANABE GROUP in China.  On the statement of origin, V.S., as "production manager" for Honetech, falsely stated "We hereby certify that all goods are Taiwan origin." Defendants APEGO and FROMUS then caused these documents to be provided to CBP at the Port of Newark in Newark, New Jersey to facilitate the entry of goods originating from China without the payment or deposit of antidumping duties.

        mm.   On or about May 30, 2007, defendants APEGO and FROMUS caused to be created false and fraudulent export documentation for a shipment of lined paper products to Customer B in the United States. Invoice number S07053010, dated May 30, 2007, falsely listed "Apego, Inc. Taiwan" as the manufacturer of filler paper to be shipped to the United States as entry 231-6128054-3, namely 408,240 pieces with an entry value of $200,038.00 (Shipment #9), when in fact the shipment contained lined paper products manufactured by THE WATANABE GROUP in China On the statement of origin of the same date, V.S., as "production manager" for Honetech, falsely stated "We hereby certify that all goods are Taiwan origin." Defendants APEGO and FROMUS then caused these documents to be provided to CBP at the Port of Norfolk in Norfolk, Virginia to facilitate the entry of filler paper originating from China without the payment or deposit of antidumping duties.

        nn.   On or about June 1, 2007, defendant APEGO exported Shipment #8, containing approximately 191,992 pieces of notebooks and filler paper packs, in cartons falsely labeled "Made in Taiwan," from Kaohsiung, Taiwan to Customer B in the United States via Newark,

New Jersey.

oo.     On or about June 1, 2007, defendant APEGO exported Shipment #9, containing approximately 408,240 packs of filler paper in cartons falsely labeled "Made in Taiwan," from Kaohsiung, Taiwan to Customer B in the United States via Norfolk, Virginia.

pp.     On or about June 7, 2007, defendants APEGO and FROMUS caused to be created false and fraudulent export documentation for a shipment of lined paper products to Customer B in the United States. Invoice numbers S07060711 and S0706717, dated May 30, 2007, falsely listed "Apego, Inc. Taiwan" as the manufacturer of filler paper to be shipped to the United States as entry 231-6128054-3, namely 327,456 pieces with an entry value of $224,476 (Shipment #10), when in fact the shipment contained lined paper products manufactured by THE WATANABE GROUP in China. On the statement of origin of the same date, V.S., as "production manager" for Honetech, falsely stated, "We hereby certify that all goods are Taiwan origin." APEGO and FROMUS then caused these documents to be provided to CBP at the Port of Norfolk in Norfolk, Virginia to facilitate the entry of filler paper and composition notebooks originating from China without the payment or deposit of antidumping duties.

qq.     On or about June 7, 2007, defendants APEGO and FROMUS caused to be created false and fraudulent export documentation for a shipment of lined paper products to Customer B in the United States. Invoice numbers S07060701 and S0760704, dated June 7, 2007, falsely listed "Apego, Inc. Taiwan" as the manufacturer of composition notebooks to be shipped to the United States as entry 231-6128635-9, namely 99,840 pieces with an entry value of $188,698.00 (Shipment #11), when, in fact, the shipment contained lined paper products manufactured by THE WATANABE GROUP in China. On the statement of origin of the same date, V.S., as "production manager" for

24

Honetech, falsely stated "We hereby certify that all goods are Taiwan origin." Defendants APEGO and FROMUS then caused these documents to be provided to CBP at the Port of Los Angeles, Los Angeles, California to facilitate the entry of composition notebooks originating from China without the payment or deposit of antidumping duties.

      rr.    On or about June 7, 2007, defendants APEGO and FROMUS caused to be created false and fraudulent export documentation for a shipment of lined paper products to Customer B in the United States. Invoice number S0760703, dated June 7, 2007, falsely listed "Apego, Inc. Taiwan" as the manufacturer of notebooks to be shipped to the United States as entry 231-6128635-9, namely 99,840 pieces with an entry value of $188,698.00 (Shipment #12), when, in fact, the shipment contained lined paper products manufactured by THE WATANABE GROUP in China. On the statement of origin of the same date, V.S., as "production manager" for Honetech, falsely stated, "We hereby certify that all goods are Taiwan origin." Defendants APEGO and FROMUS then caused these documents to be provided to CBP at the Port of Los Angeles, Los Angeles California to facilitate the entry of notebooks originating from China without the payment or deposit of antidumping duties.

      ss.    On or about June 8, 2007, defendant APEGO exported Shipment #10, containing approximately 327,456 packs of filler paper, in cartons falsely labeled "Made in Taiwan," from Kaohsiung, Taiwan to Customer B in the United States through Norfolk, Virginia.

      tt.    On or about June 9, 2007, defendant APEGO exported Shipment #11, containing approximately 99,840 notebooks, in cartons falsely labeled "Made in Taiwan," from Kaohsiung, Taiwan to Customer B in the United States through Los Angeles, California.

      uu.    On or about June 9, 2007, defendant APEGO exported Shipment #12,

25

containing approximately 99,840 notebooks, in cartons falsely labeled "Made in Taiwan," from Kaohsiung, Taiwan to Customer B in the United States through Los Angeles, California.

vv.    On or about July 5, 2007, defendants APEGO and FROMUS caused to be created a false and fraudulent invoice and packing list for the shipment of notebooks made in China to the United States, namely invoice number HI-0705-2007, dated July 5, 2007, and a packing list of the same date, for 689,040 pieces with an entry value of $183,974.00, for entry BRL-0008233-5 (Shipment #13). To obfuscate the true origin of the goods in China, the invoice and packing list were falsely and fraudulently printed under the header of an unaffiliated company, G.H.Y., Inc., with an address in Kaohsiung, Taiwan.    Defendants APEGO and FROMUS caused the fraudulent documentation to be provided to CBP at the Port of Los Angeles in Los Angeles, California.

ww.    On or about July 5, 2007, defendants APEGO and FROMUS caused to be created a false and fraudulent invoice and packing list for the shipment of notebooks made in China to the United States, namely invoice number HI-0705-2007A, dated July 5, 2007, and a packing list of the same date, for 723,324 pieces with an entry value of $203,073.00, for entry MN8-1011132-3 (Shipment #14). To obfuscate the true origin of the goods in China, the invoice and packing list were falsely and fraudulently printed under the header of an unaffiliated company, G.H.Y., Inc., with an address in Kaohsiung, Taiwan.    Defendants APEGO and FROMUS caused the fraudulent documentation to be provided to CBP at the Port of Los Angeles in Los Angeles, California.

xx.    On or about July 5, 2007, defendant APEGO exported Shipment #13, containing approximately 689,040 notebooks, in cartons falsely labeled "Made in Taiwan," from Keelung, Taiwan to Los Angeles, California through the Port of Los Angeles.

yy.    On or about July 5, 2007, defendant APEGO exported Shipment #14,

containing approximately 723,324 notebooks, in cartons falsely labeled "Made in Taiwan," from Keelung, Taiwan to Los Angeles, California through the Port of Los Angeles.

zz.   On or about July 26, 2007, defendants APEGO and FROMUS caused to be created a false and fraudulent invoice and packing list for the shipment of notebooks made in China to the United States, namely invoice number HI-0726-2007, dated July 26, 2007, and a packing list of the same date, for 194,384 pieces with an entry value of $273,334.00, entry MN8-1011495-4 (Shipment #15). To obfuscate the true origin of the goods in China, the invoice and packing list were falsely and fraudulently printed under the header of an unaffiliated company, G.H.Y., Inc., with an address in Kaohsiung, Taiwan.   Defendants APEGO and FROMUS caused the fraudulent documentation to be provided to CBP at the Port of Los Angeles in Los Angeles, California.

aaa.   On or about July 31, 2007, defendant APEGO exported Shipment #15, containing approximately 194,384 notebooks, in cartons falsely labeled "Made in Taiwan," from Keelung, Taiwan to Los Angeles, California through the Port of Los Angeles.

bbb.   On or about September 5, 2007, F.Z. wrote an email to A.C. stating "We have almost finished the two sets of documents for customs. However, everybody is overwhelmed from being so busy making fake documents. To make sure they are accurate, we will send them to you tomorrow for a thorough check."

ccc.   On or about September 29, 2007, defendant JENNIFER CHEN sent an email to other APEGO employees stating that she had spoken with A.Z. and learned that Taiwanese customs had stopped 68 containers at the port because defendant APEGO "cannot provide them the manufacturer's name." Defendant CHEN proposed two courses of action. Her first proposal was to ask another company to make changes to the boxes, "smuggle them out, and then gradually get rid

27

of them." Defendant CHEN noted that since this other company, D.Y., is a manufacturer "there should be no problem for them to send out products." The second option defendant CHEN proposed was "find a paper products manufacturer in Taiwan and export our products under their name. We will still change boxes and export the products under a manufacturer's name. For example, C.Y., or...?" Defendant Chen ended the email by stating, "Please help us figure out how to solve the problem; otherwise, we will have to sell the products in those containers in a night market."

ddd.    On or about September 10, 2007, a representative of defendant APEGO  in Taiwan emailed defendant JENNIFER CHEN to inform her that an official from the Taiwanese Bureau of Foreign Trade called asking questions about the true country of origin of APEGO's products, and that the representative had assured the official "that the products are made in Taiwan." The representative informed defendant CHEN that the representative raised the prospect of bankruptcy if a fine were imposed and assured the official that "[a]s long as the company does not file bankruptcy, it will keep making contribution to the nation. It will make an even more significant contribution to the Bureau. At the end, she told me that instead of imposing a fine on us, it would be a warning this time, and that we have to provide an import certificate from the seller next time when we import made-in-Taiwan products. Case closed....Yay!"

eee.    In or about April 2008, defendant CHI-CHENG GUNG, a/k/a "Curtis Gung," as part of an effort to conceal the conspiracy by retrieving a laptop containing incriminating information by his recently terminated assistant, A.C., together with defendant JENNIFER CHEN, staked out and directed other APEGO employees to stake out the apartment of A.C. around the clock, and directed APEGO employees to use all contact information for A.C. at their disposal to try to find A.C.

fff.  On or about April 28, 2008, defendant CHI-CHENG GUNG, a/k/a "Curtis Gung," sent an email to APEGO employee E.T., stating that one option for dealing with defendant GUNG's recently terminated assistant, A.C., was to "File crime and arrest [A.C.] but think about the Anti-dumping information released to US customs by [A.C.] if she is really piss [sic] off."

ggg.  In or about February 2010, during the exit interview for an employee departing defendant APEGO, defendant JENNIFER CHEN warned the employee in person at the company's head office in Georgia not to disclose what the employee had learned about the anti-dumping duty evasion scheme.

In violation of Title 18, United States Code, Section 371.

## COUNT TWO

On or about July 11, 2006, in the Northern District of Georgia, defendants

APEGO, INC.,
CHI-CHENG GUNG, a/k/a "Curtis Gung,"
FROMUS PSYCHE INTERNATIONAL, INC.
CHONG-SIEN WU, a/k/a "Forth Wu," and
ZUORU HE,

did enter and introduce, and attempt to enter and introduce, into commerce of the United States certain notebooks imported from the People's Republic of China through Taiwan, by means of an invoice these defendants knew to be fraudulent and false, namely invoice number S06061901, dated July 19, 2006, for Entry 231-2773199-3, listing 150,336 pieces valued at $503,626.00 and listing the manufacturer as Fromus Psyche International, Inc. in Tainan, Taiwan, which invoice falsely stated the country of origin and manufacturer;

In violation of Title 18, United States Code, Sections 542 and 2.

29

## COUNT THREE

On or about July 20, 2006, in the Northern District of Georgia, defendants

APEGO, INC.,
CHI-CHENG GUNG, a/k/a "Curtis Gung,"
FROMUS PSYCHE INTERNATIONAL, INC.
CHONG-SIEN WU, a/k/a "Forth Wu," and
ZUORU HE,

did enter and introduce, and attempt to enter and introduce, into commerce of the United States certain lined paper products imported from the People's Republic of China through Taiwan, by means of an invoice these defendants knew to be fraudulent and false, namely invoice number S06062601, dated June 26, 2006, for Entry 231-2773227-2, listing 338,256 pieces valued at $1,133,157.00 and listing the manufacturer as Fromus Psyche International, Inc. in Tainan, Taiwan, which invoice falsely stated the country of origin and manufacturer;

In violation of Title 18, United States Code, Sections 542 and 2.

## COUNT FOUR

On or about July 20, 2006, in the Northern District of Georgia, defendants

APEGO, INC.,
CHI-CHENG GUNG, a/k/a "Curtis Gung,"
FROMUS PSYCHE INTERNATIONAL, INC.
CHONG-SIEN WU, a/k/a "Forth Wu," and
ZUORU HE,

did enter and introduce, and attempt to enter and introduce, into commerce of the United States certain lined paper products imported from the People's Republic of China through Taiwan, by means of an invoice these defendants knew to be fraudulent and false, namely invoice number S06062602, dated June 27, 2006, for Entry 231-2773228-0, listing 219,234 pieces valued at $734,434.00 and listing the manufacturer of the notebooks as Fromus Psyche International, Inc. in Tainan, Taiwan, which invoice falsely stated the country of origin and manufacturer;

30

In violation of Title 18, United States Code, Sections 542 and 2.

## COUNT FIVE

On or about April 18, 2007, in the Northern District of Georgia, defendants

APEGO, INC.,
CHI-CHENG GUNG, a/k/a "Curtis Gung,"
FROMUS PSYCHE INTERNATIONAL, INC.
CHONG-SIEN WU, a/k/a "Forth Wu," and
ZUORU HE,

did enter and introduce, and attempt to enter and introduce, into commerce of the United States certain lined paper products imported from the People's Republic of China through Taiwan, by means of an invoice and a packing list these defendants knew to be fraudulent and false, namely invoice number S07032901H, dated March 29, 2007, for Entry 231-5975468-1, listing 209,784 pieces valued at $169,921.00, and listing "Apego, Inc. Taiwan" as the manufacturer and the country of origin as Taiwan, and a packing list dated March 29, 2007 stating "Country of Origin: Made in Taiwan," which invoice and packing list falsely stated the manufacturer and country of origin;

In violation of Title 18, United States Code, Sections 542 and 2.

## COUNT SIX

On or about April 20, 2007, in the Northern District of Georgia, defendants

APEGO, INC.,
CHI-CHENG GUNG, a/k/a "Curtis Gung,"
FROMUS PSYCHE INTERNATIONAL, INC.
CHONG-SIEN WU, a/k/a "Forth Wu," and
ZUORU HE,

did enter and introduce, and attempt to enter and introduce, into commerce of the United States certain lined paper products imported from the People's Republic of China through Taiwan, by means of an invoice and packing list these defendants knew to be fraudulent and false, namely invoice

31

number S07032901G1, dated March 29, 2007, for Entry 231-5975508-4, listing 174,239 pieces, valued at $170,239.00, and listing "Apego, Inc., Taiwan" as the manufacturer, and a packing list dated March 29, 2007, stating "Made in Taiwan," which invoice and packing list falsely stated the manufacturer and country of origin;

In violation of Title 18, United States Code, Sections 542 and 2.

## COUNT SEVEN

On or about June 2, 2007, in the Northern District of Georgia, defendants

APEGO, INC.,
CHI-CHENG GUNG, a/k/a "Curtis Gung,"
FROMUS PSYCHE INTERNATIONAL, INC.
CHONG-SIEN WU, a/k/a "Forth Wu," and
ZUORU HE,

did enter and introduce, and attempt to enter and introduce, into commerce of the United States certain lined paper products imported from the People's Republic of China through Taiwan, by means of invoices these defendants knew to be fraudulent and false, namely invoices number S07051801, S07051802 and S07051806, each dated May 18, 2007, for Entry 231-6126758-1, listing a total of approximately 124,800 pieces, valued at $235,871.00, and each listing the manufacturer as "Apego, Inc. Taiwan" and stating "Made in Taiwan," which invoices falsely stated the manufacturer and country of origin;

In violation of Title 18, United States Code, Sections 542 and 2.

## COUNT EIGHT

On or about June 7, 2007, in the Northern District of Georgia, defendants

APEGO, INC.,
CHI-CHENG GUNG, a/k/a "Curtis Gung,"
FROMUS PSYCHE INTERNATIONAL, INC.
CHONG-SIEN WU, a/k/a "Forth Wu," and
ZUORU HE,

32

did enter and introduce, and attempt to enter and introduce, into commerce of the United States certain lined paper products imported from the People's Republic of China through Taiwan, by means of an invoice these defendants knew to be fraudulent and false, namely an invoice, dated May 10, 2007, for Entry MN8-1010359-3, invoice number HI-0510-2007 on the letterhead of "Honetech International, Inc., Tainan, listing 851,940 pieces, valued at $244,336.00, and stating "Made in Taiwan," which invoice falsely stated the manufacturer and country of origin;

In violation of Title 18, United States Code, Sections 542 and 2.

## COUNT NINE

On or about June 19, 2007, in the Northern District of Georgia, defendants

APEGO, INC.,
CHI-CHENG GUNG, a/k/a "Curtis Gung,"
FROMUS PSYCHE INTERNATIONAL, INC.
CHONG-SIEN WU, a/k/a "Forth Wu," and
ZUORU HE,

did enter and introduce, and attempt to enter and introduce, into commerce of the United States certain lined paper products imported from the People's Republic of China through Taiwan, by means of an invoice and statement of origin these defendants knew to be fraudulent and false, namely an invoice, dated June 7, 2007, for Entry 231-6128646-6, invoice number S07060703, listing 99,840 pieces, valued at $188,698.00, and listing the manufacturer as "Apego Inc. Taiwan," and a statement of origin, dated June 7, 2007, stating, "We hereby certify that all goods are Taiwan origin," which invoice and bill of lading falsely stated the manufacturer and country of origin;

In violation of Title 18, United States Code, Sections 542 and 2.

33

## COUNT TEN

On or about June 19, 2007, in the Northern District of Georgia, defendants

APEGO, INC.,
CHI-CHENG GUNG, a/k/a "Curtis Gung,"
FROMUS PSYCHE INTERNATIONAL, INC.
CHONG-SIEN WU, a/k/a "Forth Wu," and
ZUORU HE,

did enter and introduce, and attempt to enter and introduce, into commerce of the United States

certain lined paper products imported from the People's Republic of China through Taiwan, by means

of invoices and a statement of origin these defendants knew to be fraudulent and false, namely

invoices number S07060701 and S0760704, each dated June 7, 2007 for Entry 231-6128635-9, listing

a total of 99,840 pieces, valued at $188,698.00 and both listing the manufacturer as "Apego, Inc.,

Taiwan," and a statement of origin, dated June 7, 2007, stating "We hereby certify that all goods are

Taiwan origin," which invoice and bill of lading falsely stated the country of origin;

In violation of Title 18, United States Code, Sections 542 and 2.

## COUNT ELEVEN

On or about June 24, 2007, in the Northern District of Georgia, defendants

APEGO, INC.,
CHI-CHENG GUNG, a/k/a "Curtis Gung,"
FROMUS PSYCHE INTERNATIONAL, INC.
CHONG-SIEN WU, a/k/a "Forth Wu," and
ZUORU HE,

did enter and introduce, and attempt to enter and introduce, into commerce of the United States

certain lined paper products imported from the People's Republic of China through Taiwan, by means

of an invoice and a statement of origin these defendants knew to be fraudulent and false, namely

invoice numbers S0705300, S07053004, and S07053008, each dated May 30, 2007 for Entry 231-

6128453-7, invoice, listing 191,992 pieces, valued at $230,041.00, and bill of lading, number

34

MAEU854523679, dated June 1, 2007, both listing the manufacturer as "Apego Inc., Taiwan" and country of origin as Taiwan, which invoice and bill of lading falsely stated the country of origin;

In violation of Title 18, United States Code, Sections 542 and 2.

## COUNT TWELVE

On or about June 26, 2007, in the Northern District of Georgia, defendants

APEGO, INC.,
CHI-CHENG GUNG, a/k/a "Curtis Gung,"
FROMUS PSYCHE INTERNATIONAL, INC.
CHONG-SIEN WU, a/k/a "Forth Wu," and
ZUORU HE,

did enter and introduce, and attempt to enter and introduce, into commerce of the United States lined filler imported from the People's Republic of China through Taiwan, by means of an invoice and statement of origin these defendants knew to be fraudulent and false, namely invoice number S07053010, dated May 30, 2007, for Entry 231-6128054-3, listing 408,240 pieces valued at $200,038.00 and listing the manufacturer as "Apego, Inc. Taiwan," and a statement of origin, dated May 30, 2007, stating "We hereby certify that all goods are Taiwan origin," which invoice and statement of origin falsely stated the manufacturer and country of origin;

In violation of Title 18, United States Code, Sections 542 and 2.

## COUNT THIRTEEN

On or about July 3, 2007, in the Northern District of Georgia, defendants

APEGO, INC.,
CHI-CHENG GUNG, a/k/a "Curtis Gung,"
FROMUS PSYCHE INTERNATIONAL, INC.
CHONG-SIEN WU, a/k/a "Forth Wu," and
ZUORU HE,

did enter and introduce and attempt to enter and introduce into commerce of the United States certain lined paper products imported from the People's Republic of China through Taiwan, by means of

invoices and a statement of origin these defendants knew to be fraudulent and false, namely invoice numbers S07060711 and S0706717, dated June 7, 2007 for Entry 231-6128829-8, listing a total of 327,456 pieces valued at $224,476.00, and listing the manufacturer as "Apego, Inc. Taiwan," and a statement of origin, dated June 7, 2007, stating "We hereby certify that all goods are Taiwan origin," which invoices and statement of origin falsely stated the manufacturer and country of origin;

In violation of Title 18, United States Code, Sections 542 and 2.

A ___True___ BILL

_Steven Cousins_
FOREPERSON

SALLY QUILLIAN YATES
UNITED STATES ATTORNEY

By: _____

BRIAN M. PEARCE
ASSISTANT UNITED STATES ATTORNEY
Suite 600, 75 Spring Street, S.W.
Atlanta, GA 30303
(404) 581-6217
Georgia Bar No. 587787

36